1
2

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

3
4
5

ROBERT WILLIAMSON, III, an individual

6

Plaintiff,

7

vs.

8
9

VICTORIA L. GUNVALSON, an individual;
WOO HOO PRODUCTIONS, LLC; DAVID
BROOKS AYERS, an individual,

10

Defendants.

11

AND RELATED CLAIMS

12

Base Case No.: 2:13-cv-01019-JAD-GWF

Member Case No.: 2:13-cv-02022-JAD-GWF

**Order Granting in Part and Denying in
Part Defendants' Motion for Summary
Judgment
(Doc. 53)**

13        Defendants Victoria Gunvalson and Woo Hoo Productions, LLC, move for summary

14  judgment against Plaintiff Robert Williamson, a professional poker player with whom Gunvalson

15  partnered to form a vodka business that capitalized on Gunvalson's recurring role on a reality

16  television show.  Defendants claim Williamson lacks standing to bring his vodka-business-related

17  claims because, if any party was injured, it was the company Vicki's Vodka, not Williamson

18  personally.  Defendants also claim that each of Williamson's business-related claims fails on its

19  merits and that his remaining claims, which are based on a settlement agreement he and Gunvalson

20  signed, fail due to Williamson's anticipatory breach.

21        Williamson responds that he has standing because he was personally injured by defendants'

22  alleged breached, particularly the alleged breach of the oral agreement establishing the parties'

23  obligations to one another.  At the time that agreement was made, Williamson contends, Vicki's

24  Vodka did not even exist as a company, so it could not be injured.  Williamson claims he did not

25  anticipatorily breach the settlement agreement: that document merely required him to dismiss the

26  first lawsuit he brought against Gunvalson; it did not prohibit him from filing a second one.

27        I find that genuine issues of material fact exist with respect to some, but not all, of

28  Williamson's claims against Gunvalson and Woo Hoo.  I therefore grant summary judgment in part

1   and deny it in part.[1]  I grant summary judgment against Williamson with respect to his claims for

2   unjust enrichment (Count IV), civil conspiracy (Count VI), and intentional infliction of emotional

3   distress (Count IX).  I deny it with respect to Williamson's claims for breach of contract (Count I);

4   breach of the convenant of good faith and fair dealing (Count II); misrepresentations, fraud, and

5   omissions (Count III); and promissory estoppel (Count V).

6                                      **Background**

7   **I.      The Oral Agreement**

8           In the summer of 2012, Williamson began negotiations with Mike Nicholson and defendant

9   Gunvalson to start "Vicki's Vodka."[2]  Gunvalson's nickname is "Vicki" and for several years she has

10  appeared on the television show "The Real Housewives of Orange County."  The vodka company

11  was set up to capitalize on her role on the show.

12          The first official meeting occurred in a conference room at Williamson's Las Vegas

13  condominium on June 3, 2012.[3]  There, the parties orally agreed that (1) Williamson would make

14  "substantial capital contributions to Vicki's Vodka" and (2) Gunvalson would make efforts to

15  promote the products and brand.[4]  No written agreement was penned to memorialize this

16  arrangement.

17  **II.     The Membership-Interest Purchase Agreement**

18          Soon after that initial meeting, Nicholson withdrew from the venture, leaving Williamson

19  and Gunvalson each with a 50% interest.[5]  Gunvalson then gave part of her share to her boyfriend

20

21  ────────────────

22  [1] Defendants note that Williamson did not file his responsive brief until 15 days after the deadline
    and that he made no requests for an extension. *See* Doc. 69 at 3.  I do not see the value in striking
23  Williamson's late brief at this point, but I do caution him that the judges of this district spend a lot of
    time crafting our local rules and do not like to see them violated, particularly so cavalierly.
24

25  [2] *See* Doc. 63 at 3.

26  [3] *Id.*

27  [4] *Id* at 4–5.

28  [5] *Id.* at 5.

1    David Brooks Ayers, who, in turn, sold it to Williamson for $50,000.[6]  After this exchange, which

2    was memorialized in a Membership Interest Purchase Agreement (MIP), Williamson believed that he

3    owned 66.67% of Vicki's Vodka and Gunvalson owned the remaining 33.3%.[7]  The MIP contains an

4    integration clause that makes clear no representations outside of the agreement were made.[8]

5    **III.    The Settlement Agreement**

6           According to the defendants, Williamson and others confronted Gunvalson with disparaging

7    and disturbing allegations about Ayers two weeks after the MIP was executed.  Believing the

8    allegations, Gunvalson terminated her romantic affiliation with Ayers.  Over the next several weeks,

9    however, Gunvalson "came to doubt Williamson's allegations against Ayers."[9]  Her working

10   relationship with Williamson suffered, and she eventually had her attorney send Williamson a letter

11   requesting that he seek pre-approval before using her name or likeness in connection with the

12   business.[10]  The letter also reiterated that the business still lacked an operating agreement and

13   expressed Gunvalson's concern that Williamson "was going rough with the business and would

14   tarnish Gunvalson's name and likeness in the process."[11]

15          Four weeks later, on June 7, 2013, Williamson filed a complaint against Gunvalson and

16   Ayers in what is now the base case.[12]  Williamson alleged that Gunvalson breached her contractual

17   obligation to promote Vicki's Vodka and that Gunvalson and Ayers tricked him, with the MIP

18   agreement, into buying Ayers's shares in the business, knowing full well that those shares would

---

[6] *See* 2:13-cv-02022-JAD-GWF ("*Member Case*"), Doc. 1-1 at 25.

[7] Doc. 63 at 5.

[8] *Id*. at 29.

[9] *Id*. at 8.

[10] *Id*.

[11] *Id*.

[12] Doc. 1.

1    ultimately be worthless.[13]

2         About a month later, Gunvalson and her manager flew to Las Vegas to meet with Williamson

3    and try to settle the dispute.  Accounts of what happened next conflict.  According to Williamson,

4    he and Gunvalson negotiated a settlement agreement that was executed on July 15, 2013, shortly

5    after the meeting.[14]  According to defendants, however, Gunvalson was coerced into signing the

6    settlement agreement right before a scheduled television appearance on the show "Watch What

7    Happens Live," a show she helped get Williamson booked on as well.[15]  Defendants contend that just

8    hours before the show, which is shot live and appears on the same network as Gunvalson's show,

9    Williamson began calling Gunvalson and threatening that if she did not sign the settlement

10   agreement, he would tell the press that Gunvalson had defrauded him.  Because Gunvalson did not

11   have a copy of the agreement in front of her, Williamson came to her dressing room, document in

12   hand, and told her to sit it.  Gunvalson claims she did not even read the document but "simply

13   signed it out of fear that Williamson would create a scene on the live broadcast and slander her to the

14   media, potentially ruining her opportunity to renew her contract with Bravo."[16]

15        That day, after getting Gunvalson's signature, Williamson dismissed the lawsuit against her.[17]

16   Seven weeks later, Williamson filed a second lawsuit against Gunvalson (and others).[18]  The

17   allegations in the second lawsuit are almost identical to those in the lawsuit Williamson agreed to

18   dismiss; there are just more of them—including an allegation that Gunvalson breached the settlement

19   agreement—and also more named parties. [19]

20

21   _____

     [13] *See* Doc. 1 at ¶¶ 23–29, 55.
22
     [14] Doc. 63 at 6–7.
23
     [15] Doc. 53 at 9–10.
24
     [16] Doc. 53 at 10.
25
     [17] *See* Doc. 6.
26
     [18] *Member Case*, Doc. 1-1 at 2.
27
     [19] Compare *Member Case*, Doc. 1-1 at ¶¶ 14-31 to *Base Case*, Doc. 1 at ¶¶ 14-31.
28

1      Defendant argues that this second lawsuit constitutes an anticipatory breach of the settlement

2   agreement.  Williamson responds that the settlement agreement obligated him only "to dismiss

3   Gunvalson from the first lawsuit within ten business days of [its] execution"; "[he] did

4   not, however, agree to dismiss his claims with prejudice or to forgo filing a second lawsuit."[20]

5      Originally filed in Eighth Judicial District Court, the second lawsuit was removed to federal

6   court and then eventually consolidated with the base case.[21]  I have already granted Ayers summary

7   judgment on the claims that relate to him in that lawsuit.[22]  I now consider whether Gunvalson and

8   Woo Hoo are entilted to summary judgment, too.

9                                        **Discussion**

10  **I.      Legal standard for summary judgment**

11     Summary judgment is appropriate when the pleadings and admissible evidence "show there

12  is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of

13  law."[23]  When considering summary judgment, the court views all facts and draws all inferences in

14  the light most favorable to the nonmoving party.[24]  If reasonable minds could differ on material facts,

15  summary judgment is inappropriate because summary judgment's purpose is to avoid unnecessary

16  trials when the facts are undisputed, and the case must then proceed to the trier of fact.[25]

17     If the moving party satisfies Rule 56 by demonstrating the absence of any genuine issue of

18  material fact, the burden shifts to the party resisting summary judgment to "set forth specific facts

19  showing that there is a genuine issue for trial."[26]  The nonmoving party "must do more than simply

20  _____

21  [20] Doc. 63 at 11.

22  [21] *See Member Case*, Docs. 1, 23.

23  [22] *See* Doc. 78.

24  [23] *See Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986) (citing Fed. R. Civ. P. 56(c)).

25  [24] *Kaiser Cement Corp. v. Fishbach & Moore, Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986).

26
27  [25] *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995); *see also Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994).

28  [26] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Celotex*, 477 U.S. at 323.

1   show that there is some metaphysical doubt as to the material facts"; he "must produce specific

2   evidence, through affidavits or admissible discovery material, to show that" there is a sufficient

3   evidentiary basis on which a reasonable fact finder could find in his favor.[27]  The court only

4   considers properly authenticated, admissible evidence in deciding a motion for summary judgment.[28]

5   **II.     Defendants have not demonstrated that Williamson lacks standing**.

6          Defendants insist that Williamson does not have standing to bring any of his business-related

7   claims against Gunvalson, including his claims for breach of contract and breach of the covenant of

8   good faith and fair dealing.  They argue that the "gravamen" of these claims is injury not to

9   Williamson himself but to the limited liability company Vicki's Vodka and that, under California

10  law, members of a limited liability company—in this case, Gunvalson and Williamson—"are

11  shielded from liability from other members for alleged diminution in value to the member interest."[29]

12  They urge me in particular to rely on the California Corporations Code and three California appellate

13  cases.[30]

14          Defendants have not demonstrated, however, that California law applies here.  The record is

15  too unsettled even as to the formation of Vicki's Vodka as a limited liability company for me to grant

16  their motion for summary judgment simply on the basis of standing.  For example, as defendants

17  themselves note several times, there is no operating agreement for Vicki's Vodka.[31]  Nor have

18  defendants submitted any other document that establishes where, when, or how the company was

19  formed.  All I have is unauthenticated minutes from a meeting that allegedly took place on June 3,

20  2012.[32]

---

22  [27] *Bank of Am. v. Orr*, 285 F.3d 764, 783 (9th Cir. 2002) (internal citations omitted); *Bhan v. NME*
23  *Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991); *Anderson,* 477 U.S. at 248–49.

24  [28] Fed. R. Civ. P. 56(c); *Orr*, 285 F.3d at 773–74.

25  [29] Doc. 53 at 11.

26  [30] *See id.* at 11–12.

27  [31] *Id.* at 3, 6, 8.

28  [32] *See Member Case*, Doc. 1-1 at 21–23.

Moreover, according to one of the terms of the settlement agreement, "[Gunvalson] reaffirms that [Vicki's Vodka] will be headquarted and operated in Clark County, Nevada, for tax purposes and other reasons, that the LLC has been formed in Nevada for this purpose and any and all related accounts and further dealings will be initiated in Nevada."[33]  This representation in the record belies the notion that the company—if it exists—is governed by California law. I therefore cannot conclude as a matter of law, and based on this record, that Williamson does not have standing to bring his claims as an individual.

**III.   Defendants have not demonstrated that Gunvalson was not a party to the MIP agreement.**

Defendants claim that Gunvalson was not a party to the MIP agreement in which Williamson acquired 16.67% of Vicki's Vodka from Ayers.  Thus, in their view, for this reason, Williamson's claim that Gunvalson breached that contract necessarily fails.[34]

But Gunvalson signed the MIP agreement and committed to a number of conditions and obligations in it.  First, she agreed that she is "currently a member of the Company and owns 33.33% of the Company and the Seller (Ayers) owns 16.67% of the Company."[35]  She also agreed not to "sell, transfer, or gift any of her ownership in the Company without obtaining the written unanimous approval of the others members of the Company" and that "[a]ny such transfer without written approval shall be deemed null and void."[36]  Finally, she agreed that she "consents to, and approves this sale and transfer of the Seller's member interest to Buyer."[37]  Based on this and without any more from defendants than the conclusory statement that "Gunvalson was not a party to that agreement," I cannot conclude that are no genuine issues of material fact as to whether Gunvalson breached the MIP agreement or breached the corresponding convenant of good faith and fair dealing.

---

[33] *Id.* at 38.

[34] *See* Doc. 53 at 13–14.

[35] *Member Case*, Doc. 1-1 at 30.

[36] *Id.* at 30-31.

[37] *Id.* at 31.

1

2

3

**IV.    Defendants have not shown that Williamson anticipatorily breached the settlement agreement**.

4        Next, defendants challenge Williamson's claim that Gunvalson breached the settlement

5   agreement by arguing that Williamson committed an anticipatory breach.  They contend that once

6   Williamson initiated the second lawsuit, he himself breached the agreement, which means Gunvalson

7   was then excused from performing her part of the dealt.  The settlement agreement was designed,

8   according to defendants, to prevent future suits by Williamson against Gunvalson.

9        The actual language of the agreement, however, does not go that far.  It states only that

10  "Settling Parties agree to dismiss [Gunvalson] from the Federal Court case styled as Case

11  No. 2:31(sic)-cv-01019-RCJ-GWF within ten (10) business days of execution of this Agreement."[38]

12  It says nothing about not bringing another lawsuit.  Defendants have therefore not shown that

13  Williamson anticipatorily breached the settlement agreement, so I find that genuine issues of material

14  fact still exists over whether Gunvalson remains liable for its breach.

15

16  **V.    The existence of an integration clause in the MIP agreement does not mean Williamson's misrepresentation claim fails**.

17       Defendants challenge Williamson's claim for "misrepresentation, fraud, and omission" by

18  pointing to the integration clause in the MIP agreement.[39]  But Williamson's claim, though pled with

19  an unhelpful lack of precision, appears to cover more than just whatever communications directly lead

20  to the MIP agreement.  He seeks relief not just for the $50,000 he paid for Ayers's membership

21  interest but for his total investment in Vicki's Vodka, a number he puts at "in excess of $300,000."[40]

22  He maintains that genuine issues of material fact exist with respect to "(1) the persistent failure of

23  Gunvalson to use all efforts to promote the business of Vicki's Vodka of California; (2) the failure of

24  Gunvalson to appear at events to promote the products of Vicki's Vodka of California; (3) the failure

25  _____

26  [38] *Member Case*, Doc. 1-1 at 39.

27  [39] *See* Doc. 53 at 15.

28  [40] *Member Case*, Doc. 1-1 at 13

1  of Gunvalson to promote the products of Vicki's Vodka of California on social media outlets such as

2  Twitter and Facebook; and (4) the transfer to Ayers by Gunvalson and Woo Hoo of a portion of their

3  membership interests in Vicki's Vodka of California."[41]  He claims that Gunvalson misrepresented

4  her willingness to follow through on these commitments.  And Gunvalson has not provided sufficient

5  evidence to demonstrate that she either did follow through on these commitments or that these

6  commitments do not accurately reflect the terms of the oral agreement.  I therefore find that genuine

7  issues of material fact remain with respect to Williamson's claim for misrepresentation, fraud, or

8  omission.

9  **VII.    Williamson cannot maintain his claim for unjust enrichment**.

10         Defendants are more successful, however, in their challenge to Williamson's claim for unjust

11  enrichment.  "The phrase 'unjust enrichment' is used in law to characterize the result or effect of a

12  failure to make restitution of, or for, property or benefits received under such circumstances as to give

13  rise to a legal or equitable obligation to account therefor."[42]  It is a theory of "quasi-contract," and an

14  action grounded in this theory is not available when there is an express, written agreement because no

15  agreement can be implied when there is an express one.[43]  Williamson cannot therefore maintain his

16  unjust enrichment claims with respect to the MIP agreement or the settlement agreement. "To permit

17  recovery by quasi-contract where a written agreement exists would constitute a conversion of

18  contractual principles."[44]

19         He also cannot maintain his unjust enrichment claims with respect to the oral agreement—but

20  for a different reason.  To prove unjust enrichment, Williamson must show that (1) he conferred a

21  benefit on Gunvalson, (2) Gunvalson appreciated the benefit, and (3) Gunvalson accepted and

22  retained the benefit under circumstances that make it inequitable for her to keep the benefit without

23

24  [41] Doc. 63 at 12.

25  [42] *Leasepartners Corp. v. Robert L. Brooks Trust* 113 Nev. 747, 755 (1997) (quoting Am.Jur.2d
26  Restitution § 3 (1973)).

27  [43] *Id*. at 756 (quoting Am.Jur.2d Restitution § 6 (1973)).

28  [44] *Liphsie v. Tracy Investment Co.*, 93 Nev. 370, 379 (1977).

1  paying for its value.[45]  Williamson cannot satisfy these three elements.  He did not pay Gunvalson any

2  money as a result of the oral agreement or confer any other benefit on her; he simply took the risk of

3  investing in a vodka business.  Just because the investment did not turn out the way he hoped it would

4  does not mean Gunvalson was unjustly enriched.  I therefore grant defendants' motion for summary

5  judgment on Williamson's claim for unjust enrichment.

6  **VIII.   Williamson can maintain his claim for promissory estoppel.**

7         Nevada follows the doctrine of promissory estoppel articulated in the Restatement (Second) of

8  Contracts:

9              A promise [that] the promisor should reasonably expect to induce
             action or forbearance on the part of the promisee or a third person and
10             [that] does induce such action or forbearance is binding if injustice can
             be avoided only by enforcement of the promise.[46]

11

12  Defendants challenge Williamson's claim for promissory estoppel on the ground that "Gulvason did

13  not induce [Williamson] to do anything."[47]  Williamson responds that, because of various promises

14  Gunvalson made, he was induced both to make "capital contributions to Vicki's Vodka" and to

15  dismiss his first lawsuit.[48]

16         Defendants have not presented enough evidence to eliminate the discrepancy between these

17  two accounts.  They claim that "Gunvalson made no personal promise to [Williamson that] induced

18  [Williamson] to do anything he already had not done (namely, to invest capital)."[49]  But the

19  allegations in Williamson's verified complaint, which date these personal promises to before

20  Williamson even invested in Vicki's Vodka, tell a different story.[50]  Viewing the facts in a light most

21  ───────────────

22  [45] *Leasepartners Corp*, 942 P.2d at 187.

23  [46] *Dynalectric Co. of Nevada, Inc. v. Clark & Sullivan Constructors, Inc*. 255 P.3d 286 (Nev. 2011)
24  (quoting Restatement (Second) of Contracts § 90(1) (1981)).

25  [47] Doc. 53 at 17.

26  [48] Doc. 63 at 15.

27  [49] Doc. 53 at 17.

28  [50] *Member Case*, 1-1 at §§ 93–94.

1  favorable to Williamson, I therefore find that genuine issues of material fact preclude summary

2  judgment on Williamson's claim for promissory estoppel.

3  **IX.    Williamson cannot maintain his claim for civil conspiracy.**

4        "In Nevada, an actionable civil conspiracy is defined as 'a combination of two or more

5  persons, who by some concerted action, intend to accomplish some unlawful objective for the purpose

6  of harming another which results in damage.'"[51]  Defendants argue that Williamson's claim for civil

7  conspiracy fails against Gunvalson because "there was no predicate unlawful act by Gunvalson."[52]

8  They further contend that Williamson cannot show Gunvalson ever conspired to defraud him.[53]

9        Williamson's claim for misrepresentation, fraud, and omission supplies the predicate act for a

10  civil conspiracy claim provided that Gunvalson acted in concert with some other person.  But

11  Williamson has not identified whom that person would be.  Williamson's claims against Ayers have

12  already been dismissed,[54] and Williamson has made no specific allegations against Woo Hoo.  All he

13  has said is that "[g]enuine issues of material fact exist about the capacity in which Gunvalson acted in

14  connection with the Oral Agreement, the MIP Agreement, and the Settlement Agreement and, as a

15  result, the liability of Woo Hoo for the actions of Gunvalson."[55]  He has provided no evidence of how

16  Woo Hoo, which defendants assert is simply a limited liability company formed and controlled by

17  Gunvalson, was involved in any of the unlawful acts Gunvalson allegedly engaged in.

18        Williamson simply has not met his burden on summary judgment.  I therefore grant

19  Gunvalson's motion and enter summary judgment in favor of the defendants on Williamson's civil-

20  conspiracy claim.

21

22

23  [51] *Flowers v. Carville*, 266 F. Supp. 2d 1245, 1249 (D. Nev. 2003) (quoting *Collins v. Union Fed.*

24  *Sav. & Loan Ass'n*, 662 P.2d 610, 622 (1983)).

25  [52] Doc. 53 at 17.

26  [53] *Id.*

27  [54] *See* Doc. 78

28  [55] *See* Doc. 63 at 19.

1    **X.    Williamson cannot maintain his claim for intentional infliction of emotional distress**.

2          A claim for intentional infliction of emotional distress requires a showing of (1) extreme and

3    outrageous conduct with either the intention of, or reckless disregard for, causing emotional distress;

4    (2) the plaintiff's having suffered severe or extreme emotional distress; and (3) actual or proximate

5    causation.[56]

6          Defendants are right to point out the absence of any evidence that Williamson suffered severe

7    or extreme emotional distress.  All that Williamson offers is the statement in his verified complaint

8    that he "suffered emotional distress on account of the conduct of Gunvalson, Woo Hoo, and others."[57]

9    Conclusory statements like these cannot defeat a motion for summary judgment.  Objectively

10   verifiable evidence is needed.[58]  I therefore grant defendants' motion with respect to Williamson's

11   claim for intentional infliction of emotional distress.

12   **XI.    Williamson's "claim" for attorneys' fees is not a viable claim**.

13         Williamson's verified complaint includes a separately pled cause of action for attorneys'

14   fees.[59]  But attorneys' fees is a not a claim for relief; it's a remedy.  I therefore dismiss it as a claim.

15   This ruling does not preclude Williamson from seeking or recovering attorneys' fees, if legally

16   available; he just can't maintain this concept as an independent cause of action.

17                                                        **Conclusion**

18         Accordingly, IT IS HEREBY ORDERED that defendant's motion for summary judgment

19   (**Doc. 53**) is GRANTED IN PART and DENIED IN PART.  Summary judgment is entered against

20   Williamson and in favor of defendants on Williamson's claims for unjust enrichment (Count IV),

21   civil conspiracy (Count VI), and intentional infliction of emotional distress (Count IX).  In all other

22

23   [56] *Star v. Rabello*, 625 P.2d 90, 92 (Nev. 1981).

24   [57] Doc. 63 at 18.

25   [58] *Miller v. Jones*, 970 P.2d 571, 577 (Nev. 1998) (finding that plaintiff could not sustain his

26   emotional distress claim where although he states that he was depressed for some time, he did not

27   seek any medical or psychiatric assistance and presented no objectively verifiable evidence of the severity of his distress).

28   [59] *See Member Case*, Doc 1-1 at §§ 118–120 (Count X).

1  respects, the motion for summary judgment is denied.  Williamson's claim for attorneys' fees (Count

2  X) is dismissed because it does not state a claim for relief.

3          DATED this 25th day of August, 2015.

4

5                                                          _____

6                                                          Jennifer A. Dorsey
                                                           United States District Judge

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28