# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

Robert Williamson, III and Vicki's Vodka, LLC,

      Plaintiffs

v.

Victoria L. Gunvalson, et al.,

      Defendants

Case No.: 2:13-cv-01019-JAD-EJY

**Findings of Fact, Conclusions of Law, and Final Judgment Following Bench Trial**

For eight years, Robert Williamson, Victoria "Vicki" Gunvalson, Michael Nicholson, and their respective romantic partners and companies have battled over the fallout of failed spirits company Vicki's Vodka, LLC. By the start of the bench trial on June 15, 2021, the case had distilled down to Williamson's and Vicki's Vodka's claims against Gunvalson and Nicholson for breach of contract, misrepresentation, promissory estoppel, and breach of the implied covenant of good faith and fair dealing. While the procedural vagaries of the case are complex, the substantive issues are straightforward: Williamson claims that he was wronged after he invested in a reality-television star's alcohol company because his business partners inadequately promoted the product and unlawfully kept him from realizing the millions of dollars he was promised to reap. But based on five days of testimony and the parties' exhibits and briefing, I find that the plaintiffs have failed to prove any of their claims or damages. So I enter judgment in favor of the defendants and against the plaintiffs and close this case.

**Findings of Fact**

The Kentucky Derby produced more than mint juleps, pastel hats, and a champion thoroughbred in 2012. Three friends—Gunvalson, a long-standing cast member of reality television's "Real Housewives of Orange County"; her then-boyfriend David Brooks Ayers; and 2002 World Series of Poker winner Williamson—tentatively agreed to start a vodka business.[1] Ayers and Gunvalson had been toying with the idea for months.[2] Inspired by the success of New York-based, Real Housewife Bethenny Frankel's "Skinnygirl" line of spirits, they'd connected with Nicholson, a distiller and vodka maker, to explore marketing, purchasing, or rebranding his "Cougar Juice" vodka with Gunvalson's likeness.[3] But they needed a financial backer, preferably someone with industry contacts who could help them market the product.[4] So they approached Williamson, who was excited by the idea and keen to leverage his connections in Sin City. The group agreed that a vodka venture could be a hit, and Ayers reached out to Nicholson to iron out the details.[5]

On May 21, 2012, Ayers and Nicholson presented Williamson with financial projections for the sale and distribution of Cougar Juice vodka, tentatively rebranded as "Vicki's Vodka."[6] Prepared by Paul Stoddard, whom Nicholson knew as an authority in commercial spirits, the projections indicated that Vicki's Vodka would need only a $500,000 initial investment, and that

---

[1] Trial testimony of Victoria Gunvalson (6/15/2021). The court relied on its extensive notes from trial, confirmed by the rough trial transcripts, in drafting these findings of fact because the official transcript has not been prepared. For the parties' convenience, trial testimony is cited by the witness's last name and the date of testimony.

[2] Nicholson (6/16/2021).

[3] *Id.*

[4] Gunvalson (6/15/2021); Nicholson (6/16/2021).

[5] Nicholson (6/16/2021).

[6] *Id.* at 102–04; Plaintiffs' Exhibit (Pltfs. Ex.) 74.

its sales could generate close to $2 million in the first year, $3 million in the second year, and almost $6 million by the third year.[7]  A savvy businessman with a degree in finance, Williamson knew that some of the projected sales and cost figures were inaccurate—he thought that the advertising budget could be smaller, any projected expenses were merely a "prediction" and not a "requirement," and their holiday sales might exceed expectations.[8]  And he had some follow-up questions for Stoddard, largely about his background and qualifications.[9]  But he'd also heard that Skinnygirl had recently been acquired by a major alcohol distributor for a significant sum, and he felt that Vicki's Vodka might perform similarly.

Based on these financial projections, Williamson decided to invest in the company, and, by early June 2012, the parties agreed to launch Vicki's Vodka.[10]  While they failed to draft governing documents for the company,[11] Gunvalson, Nicholson, and Williamson agreed that they would each own roughly one-third of it.  And they all brought something unique to the venture: Nicholson, as President and CEO, had crafted an award-winning vodka and had manufacturing connections; Gunvalson, as Chief Financial Officer, had celebrity cache; and Williamson, Chief Marketing Officer, had friends in the business, cash, and, alongside his wife Cate, an eye for design.[12]  Ayers, acting as Chief Operating Officer, did not own an interest in the company.[13]

---

[7] Pltfs. Ex. 6; Nicholson (6/16/2021).

[8] Williamson (6/17/2021).

[9] *Id.*

[10] *Id.*; Pltfs. Ex. 1.

[11] Gunvalson (6/15/2021); Nicholson (6/16/2021); Williamson (6/17/2021); Pltfs. Ex. 2 ("All agreed to have the operating agreement completed by end of next week.").

[12] Williamson (6/17/2021); Pltfs. Ex. 1 at 5.

[13] Pltfs. Ex. 1 at 5.

Throughout the second half of 2012 and early 2013, each person worked to get Vicki's Vodka off the ground.  They decided that the vodka would come in four flavors—original, orange, lemon, and bacon.[14]  The Williamsons—whose roles quickly morphed from marketing to daily operations—invested significant sums of money into the business, iterating various bottle designs and labels, printing branded tank-tops, coming up with ideas for logos and mixology recipes, ordering bottles and boxes, chatting with higher-ups at various retailers and distributors, and developing packaging for the product.[15]  Nicholson began manufacturing the vodka and entering it into competitions, relying primarily on his licensing, bottling, and distribution relationships for Cougar Juice.[16]  And Gunvalson promoted the vodka, often with Ayers by her side.  She attended trade shows and conferences, where she was photographed clutching bottles of Vicki's Vodka; wore promotional clothes; negotiated product-placement spots on the Real Housewives television show; filmed portions of the show at the vodka-manufacturing facility; and poured the spirit at her backyard parties, which were featured in the show's season finale.[17]

But with their attention devoted to crafting a beautiful product, the Williamsons, Gunvalson, Ayers, and Nicholson left the less-glamorous work of getting it on retail shelves to languish.  While Nicholson secured final approval for the label from the Alcohol and Tobacco Tax and Trade Bureau,[18] no one managed to nail down distribution channels, retail outlets, or vendors for the vodka.[19]  It's also entirely unclear whether they had the necessary state liquor

---

[14] Gunvalson (6/15/2021); Pltfs. Exs. 8; 12.

[15] Williamson (6/17/2021); Pltfs. Ex. 18.

[16] Nicholson (6/16/2021).

[17] Gunvalson (6/15/2021); Williamson (6/17/2021) at 51; Pltfs. Exs. 15, 56, 61, 63.

[18] Pltfs. Ex. 4.

[19] Gunvalson (6/15/2021); Williamson (6/17/2021); Pltfs. Ex. 52 (indicating that, as of April 6, 2013, distribution channels had yet to be established).

licenses or approvals to sell the product.[20]  Like the business, the parties' personal and

professional relationships also lacked a solid foundation.  Gunvalson and Ayers had a falling out,

which affected Williamson's relationship with his wife, as well as Gunvalson's relationship with

Williamson.[21]  For his part, Nicholson fought with Ayers and Williamson, as the parties disputed

whether business funds were being properly used and accounted for.[22]  And each party remained

suspicious of the others' business practices.[23]  These disputes prompted the shuffling of various

interests in the company.  Nicholson transferred his interest to Williamson and Gunvalson, and

Gunvalson transferred some of her interest to Ayers, which Williamson later purchased,

memorializing the transaction in a purchase agreement.[24]  So by Spring 2013, Williamson owned

66% of Vicki's Vodka, Gunvalson controlled the remainder, Nicholson remained with the

company as a contractor, Ayers had little role, and the parties had a vodka that they couldn't sell

and a surfeit of mistrust.[25]

       The group's in-fighting, occurring on camera and off, made for good television but not

good business.  When Williamson sued Gunvalson and Ayers after a particularly heated phone

call, however, the parties agreed that Vicki's Vodka needed a reset if it was going to survive.[26]

On July 15, 2013, Gunvalson and Williamson tried to salvage their working relationship by

---

[20] Gunvalson (6/15/2021).

[21] Williamson (6/17/2021).

[22] Gunvalson (6/15/2021); Nicholson (6/16/2021).

[23] *See, e.g.*, Gunvalson (6/22/2021); Pltfs. Ex. 52 (April 6, 2013, letter, addressed to Williamson from Gunvalson, seeking clarification on expense records, lack of operating agreement, lack of distribution channels, and resolution of various personal disagreements).

[24] Williamson (6/17/2021); Pltfs. Ex. 46.

[25] Gunvalson (6/15/2021); Williamson (6/17/2021); Williamson (6/21/2021); Gunvalson (6/22/2021); Pltfs. Ex. 46.

[26] Gunvalson (6/15/2021).

negotiating and signing a settlement agreement.[27]  In exchange for Williamson dismissing the lawsuit, Gunvalson agreed to pay damages, continue to promote the vodka, attend events as requested, exclude Ayers from participating in the business, and make good-faith efforts to include Vicki's Vodka on the Real Housewives.[28]  The agreement stated that it would be governed by Nevada law and contained an integration clause, which noted that the agreement "supersede[d] and replace[d] any prior negotiations and agreements between the parties," whether "written or oral."[29]  Shortly after signing the agreement, Gunvalson and Williamson appeared on "Watch What Happens Live," a "recap" show for the Real Housewives, where Williamson bartended, pouring Vicki's Vodka for the cast members, and Gunvalson promoted the vodka.[30]

But while Gunvalson and Williamson maintained a veneer of civility for the broadcast, Vicki's Vodka appeared beyond repair.  Williamson continued his efforts to establish distribution contracts by dining with various retail-outlet representatives, but he failed to finalize deals with any of them.[31]  And Gunvalson continued to promote the product for a time, in keeping with the terms of the settlement agreement, by appearing on Watch What Happens Live and Joy Behar's show, posting about the vodka on her social-media pages, and negotiating with the Real Housewives franchise to feature the product on the show.[32]  But she grew frustrated with Williamson's use of her likeness on the vodka's packaging and his refusal to document his

---

[27] Pltfs. Ex. 25.

[28] *Id.*

[29] *Id.*

[30] Gunvalson (6/15/2021); Williamson (6/17/2021); Pltfs. Exs. 61, 63, 64.

[31] *See, e.g.*, Williamson (6/17/2021) (testifying that Williamson could not get a written agreement with multiple retailers or distributors); Williamson (6/21/2021).

[32] Williamson (6/17/2021).

business practices.[33]  She also could not secure future product-placement deals with the Real Housewives' producers and showrunners, short-circuiting her ability to promote the spirit on television.[34]  And given that customers still couldn't purchase the product and the company did not schedule events for her to attend, she eventually abandoned her efforts to sell the vodka.[35]  Her discontent reached its nadir, however, when she learned that Williamson had distributed the product in a Vegas hotel, seemingly without the proper licensing or permits.  So counsel for Gunvalson and Nicholson sent Williamson's counsel a letter, castigating Williamson's actions and seeking to dissolve the foundering company.[36]

   Williamson too had reached his breaking point, and, on behalf of Vicki's Vodka, decided to again sue his former business partners, Ayers, Nicholson, and Gunvalson; and their associated companies, Cougar Juice Vodka, LLC, Sweetwater Distillers, Inc., and Woo Hoo Productions, LLC.[37]  In response, Gunvalson and Nicholson filed multiple counterclaims against Williamson and Vicki's Vodka.  And Ayers filed his own claims against the Williamsons and Angela Torres, the latter of which filed counterclaims against Ayers.[38]  After more than two years of failed effort and eight years of litigation, it appears that Vicki's Vodka never sold a drop.[39]

---

[33] Gunvalson (6/22/2021).

[34] *Id.*

[35] Gunvalson (6/15/2021); Gunvalson (6/22/2021).

[36] Gunvalson (6/15/2021); Williamson (6/17/2021); Pltfs. Ex. 55 (August 20, 2013, letter, describing the lack of necessary licensing, records, or agreements to run the business, and seeking to dissolve the company).

[37] Williamson (6/21/2021); ECF No. 1.

[38] ECF Nos. 10, 66.

[39] Williamson (6/17/2021).

**Conclusions of law**

At the start of trial, I noted that the parties and claims at issue had narrowed considerably since the suit's start in 2013.[40]  After dismissing a set of tertiary claims and counterclaims between Ayers and Torres for failure to prosecute, I found that Cougar Juice, Sweetwater, and Woo Hoo Productions were in default.  I also found that Gunvalson and Nicholson had abandoned their counterclaims against Williamson and Vicki's Vodka.  This left for trial Williamson's and Vicki's Vodka's suit against Gunvalson and Nicholson for breach of contract, breach of the implied covenant of good faith and fair dealing, misrepresentation, and promissory estoppel.  I find that Williamson and Vicki's Vodka have failed to satisfy their burden of proof on any claim or prove their damages, and I enter judgment in favor of Gunvalson and Nicholson.

## I.      Theories of liability

### A.      Breach of contract

On the fourth day of trial, plaintiffs' counsel represented that this case involves only claims for breach of the duty of good faith and fair dealing and promissory estoppel, and that his clients did not intend for the July 2013 settlement agreement to form the basis of their breach-of-contract claim.[41]  But in their trial brief, the plaintiffs reverse course, arguing that the defendants breached the settlement agreement, which "had the effect of serving as an [o]perating [a]greement governing the rights and obligations of the members of Vicki's Vodka."[42]  Nevada law requires that plaintiffs in a breach-of-contract action show (1) the existence of a valid contract, (2) a breach by the defendant, and (3) damage as a result of that breach.[43]  Contract

---

[40] Gunvalson (6/15/2021).

[41] Counsel for plaintiffs (6/21/2021).

[42] ECF No. 222 at 16; *see also id.* at 12.

[43] *Richardson v. Jones*, 1 Nev. 405, 405 (Nev. 1865).

interpretation generally "presents a question of law," absent "ambiguity or other factual complexities," and the contract must be "enforced according to its terms to accomplish the intent of the parties."[44]  Courts will "not rewrite contract provisions that are otherwise unambiguous."[45]  In *Cain v. Price*, the Nevada Supreme Court recognized that settlement agreements may support a breach-of-contract claim, so long as the agreement does more than merely affirm "a preexisting duty" on the part of the promisor; it must, instead, promise something that "differs from that which [she] already promised."[46]

The evidence shows that Gunvalson did not breach the 2013 settlement agreement.  The agreement, which both Gunvalson and Williamson signed, placed many affirmative duties on Gunvalson, including: (1) promoting Vicki's Vodka; (2) attending events arranged by the company; (3) paying penalties for failing to attend events; (4) permitting "exclusive[]" use of her image for Vicki's Vodka; (5) making good-faith efforts to include Vicki's Vodka on "future seasons" of the Real Housewives; (6) excluding Ayers from attending promotional events; (7) not publicly disparaging Williamson; and (8) paying damages.[47]  And the agreement relieved her of any obligation to be involved in the "daily operations" of the company, designating her as its "face and celebrity."[48]  Gunvalson credibly testified that she performed these commitments.[49] She kept Ayers out of the picture, did not turn down appearances on behalf of the brand,

---

[44] *Fed. Ins. Co. v. Coast Converters*, 339 P.3d 1281, 1284–85 (Nev. 2014) (internal quotation marks omitted).

[45] *Farmers Ins. Grp. v. Stonik ex rel. Stonik*, 867 P.2d 389, 391 (Nev. 1994).

[46] *Cain v. Price*, 415 P.3d 25, 28 (Nev. 2018).

[47] Pltfs. Ex. 25.

[48] *Id.*

[49] Gunvalson (6/15/2021).

promoted the vodka on different talk shows, and discussed the vodka on social media.[50]
Gunvalson also described her good-faith attempts to get the vodka on future episodes of the Real
Housewives, only to have those efforts halted by the reality show's producers and
management.[51]  I find that Gunvalson employed reasonable efforts to secure the success of the
business, and that those efforts were largely undercut by missing distribution licenses, state
liquor licenses, and under-contract retailers to sell the product.[52]

Williamson's testimony does little to undermine this finding.  He complained at length of
Gunvalson's personal distaste for his business practices and behavior, but he admitted that she
promoted the brand in several ways, she successfully kept Ayers out of the business, did not
publicly disparage Williamson, and paid the $12,500 in "damages" specified in the agreement.[53]
And while he tried to assert that she failed to make appearances on behalf of the vodka, he
admitted that the company failed to schedule those appearances for her, as required by the terms
of the agreement.[54]  He also conceded that Gunvalson's ability to promote the product on the
Real Housewives was contingent upon that show's producers, and that their negotiations over
potential profit sharing were unsuccessful, through no fault of Gunvalson.[55]

Nor am I persuaded that the letter seeking to dissolve the company constituted breach of
the settlement agreement.  That letter—sent months after the company continued to flounder—
merely indicated that Gunvalson wished to end her relationship with Vicki's Vodka, "wind up its

---

[50] *Id.*

[51] Gunvalson (6/22/2021).

[52] Gunvalson (6/15/2021).

[53] Williamson (6/21/2021); Pltfs. Ex. 25.

[54] Williamson (6/21/2021).

[55] *Id.*

affairs[,] and "distribute any proceeds in accordance with the ownership interest."[56]  Contrary to Williamson's and Vicki's Vodka's assertions otherwise, the settlement agreement's terms did not somehow bind Gunvalson for life, requiring her to promote a product that could not be purchased.  It certainly did not proscribe her from seeking to terminate her own business, once it became clear that the business lacked a viable product.  And given that the parties lacked an operating agreement, which might have specified the appropriate mechanism to dissolve the partnership,[57] Gunvalson's letter appeared to be her only recourse to remove herself from the company.

The plaintiffs also fail to marshal sufficient evidence to hold Nicholson liable for breach of contract.  It is axiomatic that a plaintiff must "prove the contract and the breach by defendant[]," identifying the terms of an agreement that the defendant breached.[58]  The settlement agreement, which contains an integration clause, makes no mention of Nicholson; he is neither a signatory to the agreement nor does it place any obligations on him to perform.[59] And while Williamson alluded to certain contracts he had with Nicholson,[60] he failed to identify those agreements, explain their terms, or credibly testify as to how Nicholson breached them. The parties' testimony, in fact, indicates the opposite.  Nicholson testified that he agreed to develop, blend, manufacture, and get label approval for the vodka, relying on the business relationships he'd developed when he created Cougar Juice Vodka.  And Williamson concedes

---

[56] Pltfs. Ex. 55.

[57] Though the entity was designated as a limited liability company, Williamson repeatedly referenced his interest in it as shares of stock, revealing that the company's true form was unclear to its owners.  *See, e.g.*, Williamson (6/17/2021).

[58] *Richardson*, 1 Nev. at 408.

[59] Vicki's Vodka is also not a signatory to the agreement, although neither party raises this issue.

[60] Williamson (6/21/2021).

that Nicholson did just that—he crafted an award-winning vodka, manufactured at Sweetwaters' facilities; he secured the licenses to manufacture and blend that vodka, and he coordinated with the distribution channels he'd already established with Cougar Juice Vodka.[61]  Indeed, Williamson himself testified that he declined to use Nicholson's "normal distribution network," despite not having his own network set up, further cementing my finding that neither Nicholson nor Gunvalson breached the parties' agreement.[62]  So I decline to find either Gunvalson or Nicholson liable for breach of contract.

### B.  Breach of the implied covenant of good faith and fair dealing

The plaintiffs' trial brief abandons its implied-covenant-of-good-faith-and-fair-dealing claim against Nicholson, arguing that Gunvalson alone breached the implied covenant by (1) trying to "stop the efforts of Vicki's Vodka LLC in sending out finished[,] distilled[,] and blended vodka" and (2) seeking to dissolve the business after signing the settlement agreement.[63] Nevada law recognizes both tortious and contractual implied-covenant claims.[64]  The former requires an element of reliance, and occurs when there is a special relationship between the parties,[65] while the latter exists in all contracts.[66]  Under both theories, a plaintiff must show that the defendant's conduct was "unfaithful to the purpose of the contract and the justified expectations of the other party [were] denied."[67]  "Whether the [defendant's] actions fall outside

---

[61] Williamson (6/17/2021); Williamson (6/21/2021); Pltfs. Ex. 32.

[62] Williamson (6/21/2021).

[63] ECF No. 222 at 10–13.

[64] *A.C. Shaw Constr., Inc. v. Washoe Cnty.*, 784 P.2d 9, 9 (Nev. 1989); *Hilton Hotels Corp. v. Butch Lewis Prods., Inc.*, 808 P.2d 919, 923 (Nev. 1991).

[65] *Hilton Hotels Corp.*, 808 P.2d at 923.

[66] *A.C. Shaw Constr., Inc.*, 874 P.2d at 9.

[67] *Hilton Hotels Corp.*, 808 P.2d at 923.

the reasonable expectations of the [plaintiff] is determined by the various factors and special circumstances that shape these expectations."[68]

The record does not support the plaintiffs' breach-of-the-implied-covenant claim against Gunvalson.  As discussed above, Gunvalson adequately performed under the terms of the agreement.  And she credibly testified that she did so in good faith—she described her efforts to get the vodka on her television show, to promote the product on social media, and to get people to purchase the vodka.  She also repeatedly affirmed her desire to have a successful business, bemoaning that her business partners lacked a plan to sell the product, and that they focused on the wrong things, like developing merchandise.  I also do not find that Gunvalson's letter seeking to dissolve the company somehow undermines her testimony about her good-faith efforts to promote the vodka.  As the company lacked an operating agreement, she was entitled to try and end her business when she concluded that the project was doomed, and a letter from counsel is a common method for such action.  So I find that the plaintiffs have not established that Gunvalson's actions demonstrate a breach of the covenant of good faith and fair dealing, and I enter judgment for the defendants on this claim.

### C.    Misrepresentation

Williamson and Vicki's Vodka devote little attention to their misrepresentation claim, arguing only that if Gunvalson believed that the venture was "worthless" and "never going to have any sales," then she concealed a material fact, which is "tantamount to fraud."[69]  Under Nevada law, the elements of fraud are (1) a false representation made by the defendant, (2) defendant's knowledge or belief that the representation is false, (3) defendant's intention to

---

[68] *Id.* at 923–24.

[69] ECF No. 222 at 14.

induce the plaintiff to act in reliance on the misrepresentation, (4) plaintiff's justifiable reliance upon the misrepresentation, and (5) damages.[70]  "A defendant may also be found liable for misrepresentation even when the defendant does not make an express misrepresentation, but instead makes a representation [that] is misleading because it partially suppresses or conceals information."[71]

The plaintiffs mischaracterize Gunvalson's testimony about the worth of the company. She did not testify that she thought the company was worthless at the company's inception, thus concealing her beliefs about its viability; she testified that the company lacked worth because it had yet to establish distribution channels, retail outlets, or state liquor licenses.  And she proffered that testimony when discussing whether Williamson had been damaged by her conduct, implying that the company lacked concrete value because it had yet to sell bottles.  She did not, however, testify that she thought the company could never be profitable.  To the contrary, Gunvalson repeatedly testified that she felt that the company could succeed, that she wanted it to succeed, and that her business partners were equally committed to achieving commercial success with Vicki's Vodka.  So I enter judgment in favor of Nicholson and Gunvalson on the plaintiffs' misrepresentation claim.

### D.  Promissory estoppel

The plaintiffs tether their promissory-estoppel claim to Stoddard's financial projections, asserting that Nicholson and Gunvalson, through Ayers, induced Williamson to invest in Vicki's Vodka by the promise of immense, commercial success.  To prevail on a theory of promissory

---

[70] *Bulbman, Inc. v. Nev. Bell*, 825 P.2d 588, 592 (Nev. 1992) (citing *Lubbe v. Barba*, 540 P.2d 115, 117 (Nev. 1975)).

[71] *Blanchard v. Blanchard*, 839 P.2d 1320, 1322 (Nev. 1992) (internal quotations and citations omitted).

estoppel, a plaintiff must establish that (1) "the party to be estopped must be apprised of the true facts"; (2) the promising party must "intend that his conduct shall be acted upon, or must so act that the party asserting estoppel has the right to believe that it was so intended"; (3) the relying party "must be ignorant of the true state of facts"; and (4) the relying party "must have relied to his detriment on the conduct of the party to be estopped."[72]  In Nevada, promissory estoppel is a "substitute for consideration" and "not [] a substitute for an agreement between the parties."[73]

The plaintiffs fail to prove the existence of a promise upon which they reasonably relied. "The promise giving rise to a cause of action for promissory estoppel must be clear and definite, unambiguous as to essential terms, and the promise must be made in the contractual sense."[74]  In *Vancheri v. GNLV Corp.*, the Nevada Supreme Court upheld dismissal of a promissory estoppel claim because the plaintiff sought to enforce an insufficiently definite promise of employment, which was based entirely on his "understanding" of the parties' intentions and not supported by "any independent evidence indicating the terms of an employment contract."[75]  Like the indefinite promise in *Vancheri*, Stoddard's financial projections lack a clear or definite promise upon which Williamson could reasonably rely.  They merely indicated that a vodka business with a celebrity endorsement could perform well.  Nor do the projections identify essential terms, failing to clarify whether Cougar Juice- or Vicki's-branded vodka would generate the "promised" revenue; what licenses, retailers, or distribution channels were needed to run the

---

[72] *Pink v. Busch*, 691 P.2d 456, 459–60 (Nev. 1984) (quoting *Cheqer, Inc. v. Painters & Decorators Joint Comm., Inc.*, 655 P.2d 996, 998–99 (Nev. 1982)) (internal quotation marks omitted).

[73] *Vancheri v. GNLV Corp.*, 777 P.2d 366, 369 (Nev. 1989) (internal quotations and citation marks omitted).

[74] *Torres v. Nev. Direct Ins. Co.*, 353 P.3d 1203, 1209 (Nev. 2015).

[75] *Vancheri*, 777 P.2d at 369.

15

business; or what tasks each individual participant in the business would need to complete for it to operate.  And as the parties made clear at trial, these projections were contingent upon a multitude of intervening events occurring, including signing on partners, establishing business relationships, and putting vodka on retail shelves.

Williamson's testimony and conduct confirm that these projections were insufficiently definite to form the basis of a promissory-estoppel claim.  He failed to clarify what he thought these projections concretely promised him, and he testified that certain details in the projections were unreliable.  Drawing on his background in business, he admitted that he understood multiple aspects of the projections to be merely "predictions."[76]  And he (1) dismissed the accuracy of other details in the projections, like advertising expenses or anticipated revenue during the holidays; (2) believed that the document contained inaccuracies about what it purported to describe selling; and (3) declined to provide the full amount of start-up costs described in the documents, believing them to be over-inflated.[77]  The millions of dollars in predicted revenues, however, he deemed to be ironclad promises.

Williamson's reliance testimony is also undermined by his purchase of interest in the company from Ayers.  In acquiring Ayers's interest, Williamson explicitly agreed that he had "not relied on any business representations or warranties of [Ayers] regarding [Vicki's Vodka]," and that he had "the requisite knowledge and experience to understand the risks involved in the transactions contemplated" by the purchase agreement.[78]  Based on his testimony, it appears that

---

[76] Williamson (6/17/2021).

[77] *Id.*

[78] Pltfs. Ex. 47.

16

1  Williamson merely made the "calculated" decision to invest in a company, which is "not

2  detrimental reliance."[79]

3         But even if Stoddard's financial projections could sustain a promissory-estoppel claim, I

4  find that the evidence fails to show that the promising parties were apprised of "true" facts about

5  the company or that they somehow misled Williamson.  The testimony indicates that Nicholson,

6  Ayers, Gunvalson, and Stoddard believed that these projections contained accurate information

7  and that Vicki's Vodka could be a viable business.  Williamson himself repeatedly confirmed

8  this testimony.  He testified that he believed both Gunvalson and Ayers were excited about the

9  project, and that he thought Nicholson was almost "as excited" about the business as he was, and

10  that he "definitely wanted to see us cross the finish line."[80]  In sum, the evidence at trial merely

11  indicates that a group of people thought a business would succeed, worked hard to make that

12  business happen, but failed.  This is hardly an unlawful act.

13  **II.   Damages**

14         Even if Williamson and Vicki's Vodka had managed to prove that Gunvalson or

15  Nicholson are liable for wrongdoing, Williamson failed to adequately prove his entitlement to

16  damages, based on his 66% interest in the company.[81]  Expectation damages are available for

17  breach-of-contract, implied-covenant, misrepresentation, and promissory-estoppel claims.[82]

18

19  [79] *Mello v. Woodhouse*, 872 P.2d 337, 341 (Nev. 1994) (internal citations and quotation marks omitted).

20  [80] Williamson (6/17/2021).

21  [81] The plaintiffs eschew any entitlement to reliance or compensatory damages, exclusively

22  seeking expectation damages.  *See* ECF No. 222 at 6–8.  And, somewhat perplexingly, the plaintiffs decline to explain how Vicki's Vodka is entitled to any damage award.

23  [82] *United States v. Silver*, 245 F.3d 1075, 1080–81 (9th Cir. 2001) (explaining the calculation of expectation damages for a fraud claim); *Dynalectric Co. of Nev., Inc. v. Clark & Sullivan Constructors, Inc.*, 255 P.3d 286, 289 (Nev. 2011) ("[U]nder the Restatement, an award of expectation damages is often an appropriate remedy for promissory[-]estoppel claims.");

1   "There can be no recovery for damages that are not reasonably foreseeable at the time of the

2   contract"[83]  "Only if it can be said that the damages are the direct or natural result of the breach

3   can they be presumed foreseeable as a matter of law."[84]  Both Nevada courts and the Ninth

4   Circuit have long held that while "the amount of damages need not be proven with mathematical

5   certainty, testimony on the amount may not be speculative."[85]

6          The plaintiffs proffer three damages models, asserting that the amount owed lies

7   "somewhere between" the figures described in each calculation.[86]  The first model—which relies

8   on Stoddard's three-year financial projections and extrapolates profits over a seven-year period

9   (accounting for Gunvalson's tenure on the Real Housewives)—posits that he is owed

10  $9,260,150.74 (after taxes).[87]  The second model calculates damages similarly, though it

11  apparently removes any taxes levied against the company, and states that Williamson is owed

12  $15,433,598.50.[88]  And the third model, generated by the plaintiffs' expert Joe Leauanae,

13  anticipates that Williamson may be owed upwards of $43,000,000.[89]  Leauanae derives this

14  number from the sale and acquisition of Skinnygirl by Beam Suntory Inc. for $64,000,000,

15

16  Restatement (Second) of Contracts § 347 (2021) (noting that implied-covenant and contract
    damages are often coextensive, and can include "the loss in the value to him of the other party's
17  performance caused by its failure or deficiency").

    [83] *Daniel, Mann, Johnson & Mendenhall v. Hilton Hotels Corp.*, 642 P.2d 1086, 1087 (Nev.
18  1982).

    [84] *Id.*
19
    [85] *Clark Cnty Sch. Dist. v. Richardson Constr., Inc.*, 168 P.3d 87, 97 (Nev. 2007); *Hathaway
20  Dinwiddie Constr. Co. v. United Air Lines, Inc.*, 50 F. App'x 817, 822 (9th Cir. 2002)
    (unpublished).

21  [86] ECF No. 222 at 9.

22  [87] Pltfs. Ex. 76.

    [88] ECF No. 222 at 7 n.10.  This model also refers to an exhibit that the plaintiffs failed to admit
23  into evidence.

    [89] Pltfs. Ex. 17.

claiming that the "market forces that resulted" in that company's sale "would have had a similar and comparable impact on Vicki's Vodka."[90]   At trial, Leauanae testified that he based this conclusion exclusively on the fact that (1) both Gunvalson and Skinnygirl's owner Frankel are long-standing Real Housewives cast members; (2) both companies sold spirits; and (3) both companies operated around the same time.[91]

These models are far too speculative and unsubstantiated to warrant an award of expectation damages.  The first two models are based on Stoddard's financial projections, which, as I've addressed above, were merely early "predictions" about the potential success of either Cougar Juice Vodka or a Gunvalson-branded vodka.  Those models do not provide concrete, guaranteed revenue, given that they fail to explain or even consider the actual process of starting up the business or explain what that business might be.  And Williamson himself testified that he could not trust these models because they failed to accurately represent both anticipated revenue and expenses.  These two models also don't make sense: they anticipate profits from March 2013 to March 2014, despite no recorded sales of alcohol in March, April, May, or June 2013, prior to Williamson filing his first lawsuit.  And the fact that the model calculates damages beginning in March 2013 undercuts Williamson's theory that either Gunvalson or Nicholson caused his injuries, given that Gunvalson signed the settlement agreement in July 2013 and her counsel sought to dissolve the company in August 2013.  Finally, I do not find that Williamson credibly testified about the payments that he provided to fund the company, which are part of these damages models.  Throughout trial, he provided off-the-cuff numbers about his expenses and, when shown evidence that contradicted those claims, either testified that he must have been

---

[90] *Id.*

[91] Leauanae (6/16/2021).

1  mistaken or that those records were inaccurate.  He also frequently testified to improbably high

2  expenses lacking any documentary support, like spending upwards of $115,000 on travel for the

3  company to Reno, Las Vegas, the "East Coast," and parts of California.[92]  These are hardly the

4  type of non-speculative damages I am permitted to award.

5      Leauanae's damages model suffers from a similar lack of credibility or evidentiary

6  support.  At the outset, I am entirely unpersuaded that Frankel's and Gunvalson's alcohol

7  companies are an apples-to-apples comparison, which might support the notion that Vicki's

8  Vodka could sell for a comparable amount.  Leauanae did not explain how the two companies

9  sold similar products, were in similar financial positions, or had similar market penetration,

10  appeal, marketability, projections, or product quality.  And he admitted that he lacked financial

11  information about the operation of either company, he did not assess financial projections for

12  either company, he did not compare the celebrity appeal of the individual housewives, or

13  investigate whether an acquiring company might find both companies similarly desirable.[93]  He

14  also testified that he needed further information about both companies' financial positions to

15  finalize his analysis.[94]  Leauanae, in fact, admitted that he wasn't entirely certain how much

16  Frankel's company had actually sold for, as that information was not publicly available.[95]  Given

17  the uncertain amount of damages claimed in this case, I cannot award them, further cementing

18  my decision to enter judgment in favor of Nicholson and Gunvalson.

19

20

21

---

22  [92] Williamson (6/21/2021); Pltfs. Ex. 7.

    [93] Leauanae (6/16/2021).

23  [94] *Id.*

    [95] *Id.*

**Conclusion**

Based on these findings of fact and conclusions of law, and with good cause appearing and no reason for delay, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that **final judgment is entered in favor of defendants Nicholson and Gunvalson against plaintiffs Vicki's Vodka and Williamson on the plaintiffs' claims for breach of contract, misrepresentation, promissory estoppel, and breach of the implied covenant of good faith and fair dealing.**

As I stated at trial, IT IS FURTHER ORDERED that:

- Ayers's claim against Torres for defamation is **DISMISSED** for failure to prosecute;

- Torres's claims against Ayers for defamation, conversion, and abuse of process are **DISMISSED** for failure to prosecute; and

- Gunvalson's and Nicholson's claims against Williamson and Vicki's Vodka for fraud; breach of fiduciary duty; violations of Nev. Rev. Stat. §§ 205.473, 205.4765, 207.350, 597.810, and 18 U.S.C. §§ 1961, 2701; civil extortion; conversion; and intentional infliction of emotional distress are **DISMISSED** for failure to prosecute

**This order leaves no claims pending, and the Clerk of Court is directed to ENTER FINAL JUDGMENT and CLOSE THIS CASE.**

_____
U.S. District Judge Jennifer A. Dorsey
Dated July 30, 2021